PROTECTMARRIAGE.COM,
et al., Plaintiffs,

v.

Debra BOWEN, et al., Defendants.

No. 2:09–cv–00058–MCE–DAD.

United States District Court,
E.D. California.

Nov. 4, 2011.

David Jonathan Hacker, Alliance Defense Fund, Folsom, CA, Richard E. Coleson, James Bopp, Kaylan L. Phillips, Noel H. Johnson, The Bopp Law Firm, Terre Haute, IN, Benjamin W. Bull, Timothy Donald Chandler, Alliance Defense Fund, Scottsdale, AZ, Joseph Eugene LA Rue, Law Offices of Joseph E. La Rue, Mason, OH, for Plaintiffs.

Daniel J. Powell, Department of Justice, Attorney General's Office, San Francisco, CA, Douglas J. Woods, Seth E. Goldstein, California Department of Justice, Sacramento, CA, for Defendants.

### MEMORANDUM AND ORDER

MORRISON C. ENGLAND, JR., District Judge.

Presently before the Court are Plaintiffs'[1] Motion for Summary Judgment ("Plaintiffs' Motion"), Defendants'[2] Motion for Summary Judgment ("Defendants' Motion") and Defendants' Motion to Strike ("Motion to Strike"). These matters came on for hearing before the Court at 2:00 p.m. on Thursday, October 20, 2011. For the following reasons, Plaintiffs' Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED. Defendants' Motion to Strike is DENIED as moot.

## BACKGROUND

### A. Factual History

On November 4, 2008, the citizens of California adopted a ballot measure, Proposition 8, that changed the California Constitution such that marriage would thereafter exist only "between a man and a woman." Plaintiffs' Separate Statement of Undisputed Facts ("SSUF"), ¶ 29; Cal. Const. art. 1, § 7.5. Plaintiffs ProtectMarriage and NOM–California were primarily

1. Plaintiffs are ProtectMarriage.com—Yes on 8, a Project of California Renewal ("ProtectMarriage"); National Organization for Marriage California—Yes on 8, Sponsored by National Organization for Marriage ("NOM–California"); John Doe # 1, an individual, and as a representative of the proposed Class of Major Donors; and National Organization for Marriage California PAC ("NOM–California PAC").

2. Moving Defendants are Debra Bowen, Secretary of State for the State of California, in her official capacity; Kamala D. Harris, Attorney General for the State of California, in his official capacity; Department of Elections—City and County of San Francisco; Dennis J. Herrera, City Attorney for the City and County of San Francisco, California, in his official capacity and as a representative of the Class of Elected City Attorneys in the State of California; and Ann Ravel, Sean Eskovitz, Elizabeth Garrett, Lynn Montgomery and Ronald Rotunda, members of the California Fair Political Practices Commission, in their official capacities.

formed ballot committees established under California's Political Reform Act of 1974, Cal. Gov.Code § 81000 *et seq.* ("PRA"). Their specific purpose was to specifically support the passage of Proposition 8. SSUF, ¶¶ 1–2.

Plaintiff John Doe # 1 supported Proposition 8 and is considered a "committee" under the PRA because he contributed in excess of $10,000 to a committee that itself supported Proposition 8. *Id.,* ¶ 3. In support of the Proposition 8 campaign, such committees raised in excess of $42 million from more than 46,000 individual contributors. *See* Declaration of Lynda Cassady, ¶ 15 and its attached chart. Plaintiff National Organization for Marriage California PAC ("NOM–California PAC"), to the contrary, was formed post-election to raise and spend money on ballot initiatives and candidates relating to the issue of marriage. SSUF, ¶ 4.

California's PRA requires committees such as Plaintiffs to report certain information regarding their contributors. Specifically, Plaintiffs are required to file semiannual reports including the name, street address, occupation, name of employer, (if self-employed, the name of the business), as well as the date and amount received during the period covered by the statement of anyone who contributes more than $100 to them, both during and after active campaigns. Cal. Gov.Code §§ 84200, 84211(f). This information is then available, *inter alia,* on the website of the California Secretary of State.

Plaintiffs allege that, as a consequence of their support of Proposition 8, their contributors have been subjected to threats of violence, harassment and reprisals. Plaintiffs further allege that the PRA's $100 reporting threshold is unconstitutional, both facially and as applied to Plaintiffs. Plaintiffs further maintain that the PRA's post-election reporting requirements and the failure to purge reports

post-election are facially unconstitutional as well.

In support of their first claim, Plaintiffs submitted 58 John Doe Declarations (Plaintiffs' Exhibit 1). The first nine of those declarations were drafted in January 2009, and the rest were prepared prior to June 3, 2009. Plaintiffs have further provided a variety of media accounts, videos and articles pulled from various internet sources (Plaintiffs' Exhibits 3–4).

Plaintiffs' John Doe declarations document the following incidents that Plaintiffs allege constitute "threats, harassments and reprisals" sufficient to warrant exempting from disclosure the names of Plaintiffs' contributors:

- Establishments owned by or employing persons who contributed to or otherwise publicly supported Proposition 8 were the subjects of proposed boycotts. Declarations of John Doe # 1, # 53.

- Establishments whose owners supported or contributed to Proposition 8 were subject to picketing or protests. Declaration of John Doe # 1.

- A protest took place at a declarant's in-home Proposition 8 political rally. Declaration of John Doe # 4.

- Unsolicited phone calls, emails and letters voicing disagreement with the positions of those contributing to or supporting Proposition 8 were received by supporters of Proposition 8. Declarations of John Doe # 1, # 4–10, # 17, # 19, # 22–23, # 28–30, # 51–54, # 56.

- Flyers were circulated denouncing contributors' support of Proposition 8. Declaration of John Doe # 2.

- "Yes on 8" bumper stickers and yard signs were vandalized or stolen. In at least one instance, a sign was used to break a church window. Declarations of John Does # 3, # 7–8, # 13–

14, #16, #18, #22, #24, #26, #31, #33–48, #50, #55–58.

- Cars of "Yes on 8" supporters were keyed or vandalized (*i.e.*, windows were smashed or vehicles were egged and floured) and at least one supporter's home was egged and floured. Declarations of John Doe, #11–14.

- Individuals at "Yes on 8" sign waving events, protests or flyer distribution events encountered negative responses (including individuals shouting obscenities and arguing with sign-waivers, individuals blocking "Yes on 8" signs with "No on 8" signs, and in one instance, an individual throwing an object at a sign waver). Declarations of John Doe #13, #16, #25, #26.

- Conflicts arose with friends, family or neighbors. Declarations of John Doe #13, #15, #18, #20–21, #49.

- Individuals or businesses supporting Proposition 8 had negative reviews posted on a variety of websites. Declarations of John Doe #20, #27, #32, #51.

Most of the incidents alleged above were responses to public shows of support the declarants had made in favor of Proposition 8. *See, e.g.*, Decl. of John Doe #4 (protest held outside the entrance to declarant's gated community when declarant held a fundraiser in support of Proposition 8 at his home); Decl. of John Doe #8 (declarant "attended numerous rallies, three press conferences, and spoke at a number of churches ... [,] also participat-

ed on panel discussions" and "attended an election night gathering at a hotel ... with other supporters of Proposition 8" where the supporter's picture was taken and eventually published); Decl. Of John Doe #9 (photograph of individual at election night gathering prompted receipt of unsolicited messages on MySpace and Facebook accounts, emails and phone calls); Decl. of John Doe #20 (after seeing a yard sign supporting Proposition 8 in the yard of a shop owner, two neighbors advised declarant they would no longer frequent his store).

Although immaterial to the Court's decision, it is not at all clear from some of the declarations whether the alleged incidents were actually connected to a particular declarant's support of Proposition 8. *See, e.g.*, Decl. Of John Doe #11 (individual maintaining "Yes on 8" yard signs on her lawn and a bumper sticker on her car had her car window smashed); Decl. of John Doe #13 (believes car was keyed in retaliation for posting "Yes on 8" bumper stickers); Decl. of John Doe #23 (believes the statue of Mary, Mother of Jesus, at his church was painted orange in connection with Proposition 8).

Plaintiffs' remaining evidence, Exhibits 3 and 4, is comprised of a collection of online media, including YouTube videos, blogs, court filings in other cases, and numerous articles.[3] Because the incidents reported within these Exhibits are highly repetitive, and perhaps deceptively overwhelming, they are catalogued by type of occurrence, rather than by exhibit number, here.[4]

---

**3.** Defendants have moved to strike all evidence included in these Exhibits on the grounds that the contents: 1) are inadmissible hearsay; 2) exceed the scope of a stipulation entered into by the parties; 3) were not disclosed during discovery; or 4) were not properly authenticated. The Court is inclined to grant Defendants' Motion for a variety of reasons, not the least of which is that most of

the exhibits are indeed hearsay. However, because consideration of the evidence included in these Exhibits does not alter the Court's decision, Defendants' Motion to Strike is instead DENIED as moot.

**4.** The Court has referenced each exhibit in which the following facts are alleged to show, in part, that while Plaintiffs may characterize

- **Yard sign theft and vandalism.** First, as with their Doe declarations, Plaintiffs' evidence recounts a variety of incidences of yard-sign theft and vandalism. In some instances church windows were broken or churches were spray-painted with "No on 8" messages. One church was egged and toilet-papered. Another had adhesive poured on a doormat, keypad and window. A neighborhood in San Bernardino was targeted by vandals who spray-painted cars, fences, garages and "Yes on 8" signs. Vandals also spray-painted residential and commercial buildings in Fullerton, and a church in San Francisco was spray-painted with swastikas and angry Proposition 8 messages. Likewise, in October, 2008, someone spray-painted "No on 8" on a San Jose couple's car and garage and on their neighbor's garage. Also in San Jose, someone painted an SUV with "Bigots Live Here" and an arrow pointing to a house that had a "Yes on 8" sign on the lawn. Some of the articles make mention that law enforcement responded and, in some instances, was even able to make arrests. Exhs. 4–7, 4–29, 4–30, 4–31, 4–32, 4–33, 4–34, 4–36, 4–37, 4–38, 4–39, 4–40, 4–41, 4–45, 4–46, 4–50.

- **Disclosure lists.** Plaintiffs also provide documentation of a number of websites that, in approximately November 2008, began publishing the names of individuals and businesses that contributed to Proposition 8. Some of Plaintiffs's evidence extends beyond Proposition 8 to websites reporting the names of supporters of similar issues in other states. Exhs. 4–10, 4–11, 4–12, 4–21, 4–28, 4–83, 4–84, 4–98, 4–99, 4–103, 4–105, 4–106, 4–108, 4–109, 4–110, 4–113, 4–114, ·4–128, 4–138, 4–139, 4–142, 4–152, 4–153, 4–154.

- **Protests and rallies.** In addition, Plaintiffs provide evidence of protests and rallies undertaken in approximately November 2008. For example, a small group staged a peaceful "kiss-in" near the Mormon temple in Salt Lake City. Other protests had to be broken up by law enforcement and some protesters were arrested. Exh. 3–3, 3–8, 3–9, 4–64, 4–65, 4–66, 4–68, 4–69, 4–70, 4–71, 4–120.

- **Death threats.** Plaintiffs allege that, after participating in a rally in favor of Proposition 8 in front of City Hall, Fresno, California mayor Alan Autry and a local pastor received death threats. The pastor's church and house were also purportedly egged. According to Plaintiffs's evidence, police promptly investigated those threats and the pastor acknowledged he was confident in the investigation. Mayor Autry made clear that supporters of Proposition 8 should not "blame the gay and lesbian community" and that he believed "[m]ost of the opponents of Prop 8 and the vast, vast, majority of

their evidence as "voluminous" or "overwhelming," in many instances the same events are reported repeatedly in multiple articles, creating the false impression that there is more here than closer inspection reveals. The Court notes also that, given the anonymous nature of the John Doe declarations, it is not clear whether any of the incidents alleged in those documents may overlap with any of the incidents documented in Exhibits 3 and 4. Based on the factual descriptions in some of the John Doe declarations, it is entirely possible that some of the above declarants are reporting incidences also reported below. *Compare, e.g.,* Decl. of John Doe # 29 with Exh. 4–96. Any potential unidentified overlap is immaterial, however, and thus will be ignored.

the gay community would condemn this type of thing." *See,* Exhs. 4–2, 4–3, 4–4, 4–5, 4–6, 4–34, 4–44.

- **Bash Back.** Plaintiffs' evidence also repeatedly documents the actions taken by radical gay activist group "Bash Back." That organization allegedly interrupted services at a Michigan church and, among other things, arranged for two women to kiss in front of the pastor. The incident was investigated and the offenders later agreed in federal court to entry of a permanent injunction preventing them from invading churches anywhere in the country. Violators of that injunction could be held in contempt of court and be subject to a $10,000 fine. In addition, a Washington Bash Back chapter also purportedly glued door locks and spray-painted messages on a Mormon church. Finally, the same group appears to have targeted a conference in Washington via an anonymous online post. Exhs. 3–5, 3–6, 4–7, 4–13, 4–16, 4–17, 4–34, 4–42, 4–43, 4–53, 4–54, 4–82.

- **Disruption of a prayer walk.** In addition, Plaintiffs include several reports of a prayer walk by a group that met every Friday night in San Francisco's Castro District, which has a large gay community, to try to convert gay and lesbian individuals to a "straight lifestyle." During a November protest, a crowd convened and began shouting lewd remarks at the marchers, pushing them and throwing hot coffee, soda and alcohol at them. One man is alleged to have hit a marcher on the head with her own Bible before pushing her to the ground and kicking her. Another marcher reported that someone tried to pull his pants down. Law enforcement intervened and escorted the marchers back to their van. Exhs. 3–1, 4–7, 4–8, 4–9, 4–34.

- **Physical assaults.** A sixty-nine year old woman at a November 2008 Proposition 8 rally in Palm Springs, California was pushed and spit on. Law enforcement convinced her to press charges against the attackers. Likewise, a supporter of Proposition 8 was waiting to distribute yard signs outside of a Modesto church when someone absconded with approximately 75 signs. The Proposition 8 supporter gave chase, was allegedly punched in the face and received 16 stitches. Detectives responded and investigated the incident. Exhs. 4–7, 4–22, 4–23, 4–24, 4–25, 4–34.

Much of Plaintiffs' remaining evidence goes to alleged boycotts and "economic reprisals." By way of example:

- The chair of the 2012 U.S. Olympic team allegedly stepped down after controversy emerged over his opposition to gay marriage. Exhs. 4–18, 4–144, 4–145, 4–146.

- Negative reviews of a Sacramento ice cream parlor were posted online after it was disclosed that the company supported Proposition 8. The parlor was later the target of protesters giving out free rainbow sherbert. Exhs. 4–27, 4–120, 4–130.

- The manager of an El Coyote restaurant, who was also the daughter of the owners, left town after her $100 contribution to Yes on 8 led protesters to target the restaurant. Protests have since faded and the manager said she has received calls and other shows of support. Exhs. 4–34, 4–58, 4–77, 4–117, 4–123, 4–124, 4–125, 4–126, 4–127, 4–129, 4–133, 4–139.

- Despite some similar shows of support in his favor, the artistic director of Sacramento's California Musical Theater resigned after opponents to Proposition 8 discovered he had donated $1000 to the Yes on 8 campaign. Exhs. 4–34, 4–58, 4–77, 4–115, 4–116, 4–117, 4–118, 4–119, 4–120, 4–121, 4–124, 4–129, 4–142, 4–154.

- The director of the Los Angeles Film Festival also resigned under alleged pressure from gay-rights groups after his $1500 contribution to "Yes on 8" was publicized. Though the festival board initially tried to block his resignation, the director eventually did tender his resignation when pressure continued. Exhs. 4–34, 4–58, 4–116, 4–117, 4–122.

- A Palo Alto dentist featured on a boycott website as a result of his $1000 contribution to the "Yes on 8" campaign claims he consequently lost two patients. Exhs. 4–67, 4–117, 4–154.

- An artist who had captured images from New York's gay pride parade was the subject of verbal retaliation and an article condemning her contribution to Proposition 8. Exhs. 4–96.

- A movie theater chain, a Ventura County health food store, a San Diego hotelier, a self-storage company, and a Utah-based car dealer were all boycotted after their or their employees' contributions to Proposition 8 were publicized. Exhs. 4–111, 4–116, 4–117, 4–123, 4–129, 4–131, 4–132, 4–133, 4–134, 4–136, 4–141.

Plaintiffs also cite to evidence purportedly documenting Proposition 8–related backlash directed at the Mormon church primarily in October and November of 2008. For example:

- Two Mormon Temples (and a Knights of Columbus printing plant) received envelopes containing a white, powdery substance. Plaintiffs presume these incidents were connected to Proposition 8, though their evidence does not indicate a connection. Regardless, the FBI investigated the incidents and determined the powder was not a biological agent or toxin. Exhs. 4–34, 4–52, 4–67, 4–75, 4–76, 4–79, 4–92.

- Several churches were also spray-painted with graffiti or otherwise vandalized. Police in at least one town investigated the vandalism as a hate crime potentially linked to Proposition 8, though police in another town refused to characterize the vandalism as the work of opponents to Proposition 8. Exhs. 4–7, 4–47, 4–48, 4–49, 4–51, 4–52, 4–73, 4–90, 4–91.

- Other groups or individuals reported the Mormon church to California's Fair Elections Commission for failing to report contributions to the "Yes on 8" campaign. Similarly, websites were initiated encouraging people to petition to have the tax exempt status of the Mormon church revoked. Exhs. 4–14, 4–15, 4–19, 4–61, 4–62, 4–107.

- During the campaign, same-sex marriage advocates also allegedly produced a commercial depicting Mormon missionaries destroying the marriage license of a gay couple. Exhs. 3–7, 4–59, 4–63.

- Fires were set at Mormon churches in Washington, Utah and Colorado, and a man was prevented from starting a fire at a Los Angeles Temple. Some of the articles speculatively linked the acts or arson to Proposition 8, and in each of instance, authorities undertook an investigation

into the crimes. Exhs. 4–79, 4–80, 4–85, 4–86, 4–87, 4–88, 4–89.

- Some protests were directed specifically at the Mormon church. Exhs. 3–8, 3–9, 4–60, 4–68, 4–73, 4–75, 4–80, 4–120.
- Comedian Margaret Cho wrote and performed a song called "Fuck You Mormons" directed at the Mormon Church and its support of Proposition 8. Exh. 3–12.

Finally, Plaintiffs catalog a variety of other miscellaneous events they believe are relevant as well. For example:

- Miss California suffered backlash after stating at the Miss USA pageant that she believed marriage should exist between a man and a woman. Exh. 4–112, 4–147, 4–148, 4–149, 4–150, 4–151.
- A law firm entertaining an agreement with Republicans to defend the federal same-sex marriage ban, withdrew from the agreement after drawing fire from gay-rights groups. Exhs. 4–18, 4–135, 4–155, 4–156, 4–157.
- A New York state senator purportedly received death threats due to his opposition to same-sex marriage. Exh. 18.
- Apple, Inc., allegedly withdrew two iPhone apps from its app Store after receiving complaints from gay-rights supporters. Exh. 18.
- Neighbors engaged in a fist-fight when one attempted to steal and replace the other's yard sign. Exh. 4–34.
- A man was attacked and bitten by a dog while trying to prevent theft of a "Yes on 8" sign. Exh. 4–34.
- Cars bearing "Yes on 8" bumper stickers were keyed. Exh. 4–35.
- A "Yes on 8" table set up in the quad at the University of California,

Davis, was hit with water balloons, and students yelled "you teach hate" at those manning the table. Exh. 4–35.

- Individuals left comments, sometimes characterized as "inciting and directly threatening violence" against supporters of Proposition 8 on a variety of blogs and websites. Exh. 4–56, 4–57.
- The parent of a Galt High School student alleges his son was harassed by a teacher for his stance supporting Proposition 8. Exh. 4–102.

## B. Procedural History

In light of the above alleged acts, and because they were statutorily required to file semiannual reports on January 31, 2009, Plaintiffs initiated this action against Defendants on January 7, 2009. Plaintiffs have amended their Complaint several times, resulting in the now operative Third Amended Complaint.

On January 9, 2009, Plaintiffs filed a Motion for Preliminary Injunction, raising essentially the same arguments they raise in their current Motion, which this Court denied by formal order on January 30, 2009. At the same time, Plaintiffs also requested a Protective Order, which the Court granted. That Protective Order remains in place to date and permits the parties to redact personal information from filings not under seal. The Protective Order also grants the parties leave to file reference lists pursuant to FRCP 5.2(g). Plaintiffs did not appeal this Court's Order Denying Preliminary Injunction, nor did they seek, from either this Court or from the Ninth Circuit, a stay of that decision.

On August 25, 2011, Plaintiffs moved for summary judgment. Defendants, with two exceptions, filed a Cross–Motion and Opposition to Plaintiffs' Motion on September

15, 2011.[5] At the same time, Defendants moved to strike a large portion of Plaintiffs' evidence. Plaintiffs filed a Reply as to their own Motion and Oppositions to Defendants' Motions on September 29, 2011. Defendants filed a Reply to both their Motion for Summary Judgment ("Defendants' Reply") and their Motion to Strike on October 13, 2011.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions interrogatory answers, or other materials" "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. *See* Fed.R.Civ.P. 56(a) ("A party may move for summary judgment, identifying each claim or defense-the part of each claim or defense-on which summary judgment is sought."); *see also Allstate Ins. Co. v. Madan*, 889 F.Supp. 374, 378–79 (C.D.Cal.1995); *France Stone Co., Inc. v. Charter Township of Monroe*, 790 F.Supp. 707, 710 (E.D.Mich.1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. *See* Fed.R.Civ.P. 56(a), 56(c); *Mora v. Chem–Tronics*, 16 F.Supp.2d 1192, 1200 (S.D.Cal.1998).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting Rule 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R.Civ.P. 56(c). The opposing party must demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury

---

**5.** Defendant Jan Scully, on behalf of herself and as representative of the designated Class of District Attorneys in the State of California, submitted a position statement indicating that the Defendant Scully and the District Attorney Class "are, at best, peripheral Defendants in this case." Position Statement, 2:6–7. This class thereby states their position as follows: "[T]o the extent that the Court determines that the Motion for Summary Judgment filed by Plaintiffs is not well-taken, then Defendant Scully and the District Attorney Class oppose that motion; however, to the extent that the Court determines that any Cross–Motions filed by any other party in this case are not well-taken, Defendants herein oppose those motions." *Id.*, 2:18–3:4.

could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir.1992). Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505 (quoting *Schuylkill and Dauphin Improvement Co. v. Munson*, 81 U.S. 442, 448, 14 Wall. 442, 20 L.Ed. 867 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd*, 810 F.2d 898 (9th Cir.1987).

## ANALYSIS

Plaintiffs' basic arguments in support of their Motion are as follows: 1) California's campaign contribution disclosure requirements are unconstitutional as applied to Plaintiffs because there is a reasonable probability that such exposure will lead to threats, harassment and reprisals; 2) the $100 reporting threshold is unconstitutional, both facially and as applied to Plaintiffs, because the threshold cannot survive the requisite scrutiny and because disclosure will result in the above-described threats; and 3) post-election public ballot-measure reporting and the failure to purge public disclosures post-election are unconstitutional. Defendants counter that: 1) Plaintiffs have not shown a reasonable probability that an ordinary contributor to Plaintiffs' will face threats, harassment or reprisals; 2) the State has an important interest in disclosure that outweighs the minimal burden imposed on Plaintiffs; and 3) post-election disclosure requirements and the $100 threshold survive exacting scrutiny.

These are essentially the same arguments first brought before the Court almost three years ago on Plaintiffs' Motion for Preliminary Injunction. There, the Court held that: 1) the State had a compelling informational interest in the disclosure of contributors to ballot-initiative campaigns; 2) the $100 reporting threshold was narrowly tailored to that informational interest; 3) the post-election reporting requirement was directly related to the State's informational interest and burdened no more speech than was required; and 4) Plaintiffs were unlikely to show a reasonable probability that disclosure of the identities of Proposition 8 contributors would result in threats, harassment and reprisals, and thus Plaintiffs were unlikely to show an exemption from the disclosure requirements was warranted.

Very little has changed in this case since the Court originally addressed the parties' arguments in the context of Plaintiffs' original Motion. Even with what new evidence Plaintiffs have provided at this juncture, however, they have failed to convince

this Court that its prior reasoning was unsound or that any shift in the Court's position is justified now. Accordingly, for the following reasons, Defendants, not Plaintiffs, are entitled to summary judgment.

### A. Whether Plaintiffs Have Shown a Reasonable Probability that Disclosure of their Contributors' Identities will Result in Threats, Harassment or Reprisals

According to Plaintiffs, disclosure of the identities of their contributors must be barred because they have demonstrated a reasonable probability that such disclosure will lead to threats, harassment or reprisals. Plaintiffs' Motion, 5:16–22 (*citing Citizens United v. FEC*, —— U.S. ——, 130 S.Ct. 876, 914, 175 L.Ed.2d 753 (2010) (internal quotations omitted); *Buckley v. Valeo*, 424 U.S. 1, 74, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). This Court rejected this same argument in its Order Denying Preliminary Injunction explaining the rule as follows [6]:

> The test applicable to Plaintiffs' First Cause of Action was initially formulated in *Buckley* when the Supreme Court rejected an overbreadth challenge to all reporting requirements imposed on minor parties. 424 U.S. 1, 96 S.Ct. 612. Despite its rejection of a blanket disclosure exemption for all such groups, the Court left open the possibility that similar minor parties in the future might be able to seek such immunity if they could show that there was a reasonable probability their contributors would suffer from harassment, threats, or reprisals as a result of such revelation.
>
> The *Buckley* Court began its discussion by noting that the "governmental inter-

est in disclosure is diminished when the contribution in question is made to a minor party with little chance of winning an election. As minor parties usually represent definite and publicized viewpoints, there may be less need to inform the voters of the interests that specific candidates represent. Major parties encompass candidates of greater diversity. In many situations the label 'Republican' or Democrat' tells a voter little. The candidate who bears it may be supported by funds from the far right, the far left, or any place in between on the political spectrum. It is less likely that a candidate of, say, the Socialist Labor Party will represent interests that cannot be discerned from the party's ideological position." *Id.* at 70, 96 S.Ct. 612.

Additionally, that Court was cognizant that "the damage done by disclosure to the associational interests of the minor parties and their members and to supporters of independents could be significant. These movements are less likely to have a sound financial base and thus are more vulnerable to falloffs in contributions. In some instances fears of reprisal may deter contributions to the point where the movement cannot survive. The public interest also suffers if that result comes to pass, for there is a consequent reduction in the free circulation of ideas both within and without the political arena." *Id.* at 71, 96 S.Ct. 612. Accordingly, the *Buckley* Court determined that, though such facts were not before it, "[t]here could well be a case ... where the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the Act's

---

**6.** At times the Court has chosen to quote extensively from its prior Order Denying Preliminary Injunction because the issues facing the Court today are largely unchanged from those facing the Court then and because the Court's prior analysis is still highly relevant and directly applicable to the current facts before it today.

requirements [could not] be constitutionally applied." *Id.* That Court further observed "that unduly strict requirements of proof could impose a heavy burden, but it does not follow that a blanket exemption for minor parties is necessary. Minor parties must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim.

The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisal from either Government officials or private parties. The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient." *Id.* at 74, 96 S.Ct. 612.

[FN # 7] The *Buckley* Court noted that the facts in *NAACP v. Alabama* could possibly have warranted sustaining an as-applied challenge to Alabama's compelled disclosure requirements. *Id.* at 71, 96 S.Ct. 612. The *NAACP v. Alabama* Court stated, "We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association. Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility. Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP v. Alabama,* 357 U.S. [449], at 462–463, 78 S.Ct. 1163[, 2 L.Ed.2d 1488 (1958) ].

The Supreme Court later had occasion to apply the *Buckley* test in *Brown.* The *Brown* Court addressed the issue of "[w]hether certain disclosure requirements of the Ohio Campaign Expense Reporting Law ... [could] be constitutionally applied to the Socialist Workers Party ["SWP"], a minor political party which historically ha[d] been the object of harassment by government officials and private parties." *Brown* [*v. Socialist Workers, '74 Campaign Committee*], [459 U.S. 87, 88, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) ]. That Court emphasized several points raised in *Buckley* reiterating that "[t]he government's interests in compelling disclosures are 'diminished' in the case of minor parties ... [and at] the same time, the potential for impairing First Amendment interests is substantially greater." *Id.* at 92, 96 S.Ct. 612 (*quoting Buckley,* 424 U.S. at 70, 96 S.Ct. 612).

In *Brown,* the Court had before it " 'substantial evidence of both governmental and private hostility toward and harassment of SWP members and supporters.' Appellees introduced proof of specific incidents of private and government hostility toward the SWP and its members within the four years preceding the trial. These incidents, many of which occurred in Ohio and neighboring states, included threatening phone calls

and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office. There was also evidence that in the 12–month period before trial, 22 SWP members, including four in Ohio, were fired because of their party membership. The evidence amply support[ed] the District Court's conclusion that 'private hostility and harassment toward SWP members make it difficult for them to maintain employment.'" *Brown* at 98–99, 103 S.Ct. 416.

Moreover, "[t]he District Court also found a past history of government harassment of the SWP. FBI surveillance of the SWP was 'massive' and continued until at least 1976. The FBI also conducted a counterintelligence program against the SWP and the Young Socialist Alliance, the SWP's youth organization. One of the aims of the 'SWP Disruption Program' was the dissemination of information designed to impair the ability of the SWP and the YSA to function. This program included 'disclosing to the press the criminal records of SWP candidates, and sending anonymous letters to SWP members, supporters, spouses, and employers.' Until at least 1976, the FBI employed various covert techniques to obtain information about the SWP, including information concerning the source of its funds and the nature of its expenditures. The District Court specifically found that the FBI had conducted surveillance of the Ohio SWP and had interfered with its activities within the State. Government surveillance was not limited to the FBI. The United States Civil Service Commission also gathered information on the SWP, the YSA, and their supporters, and the FBI routinely distributed its reports to Army, Navy, and Air Force Intelligence, the United States Secret Service, and the Immigration and Natu-

ralization Service." *Id.* at 99–100, 103 S.Ct. 416.

Finally, "the Government possesse[d] about 8,000,000 documents relating to the SWP, YSA ... and their members ... Since 1960, the FBI ha[d] had about 300 informants who were members of the SWP and/or YSA and 1,000 non-member informants. Both the Cleveland and Cincinnati FBI field offices had one or more SWP or YSA member informants. Approximately 2 of the SWP member informants held local branch offices. Three informants even ran for elective office as SWP candidates.

The 18 informants whose files were disclosed to [the Special Master] received total payments of $358,648.38 for their services and expenses." *Id.* at 100 n. 18, 103 S.Ct. 416.

The *Brown* Court determined that "the evidence of private and government hostility toward the SWP and its members establishe[d] a reasonable probability that disclosing the names of contributors and recipients [would] subject them to threats, harassment, and reprisals." *Id.* at 100, 103 S.Ct. 416.

*ProtectMarriage.com v. Bowen,* 599 F.Supp.2d 1197, 1212–1214 (E.D.Cal.2009).

Based on the same above authorities, Plaintiffs now ask this Court to issue a similar decision and to exempt those contributing to Plaintiffs' cause from the disclosure requirements of the PRA. In support of their argument, Plaintiffs point to the incidents described by the Court above. Those incidents are characterized by Plaintiffs as including death threats, physical assaults and threats of violence, vandalism and threats of destruction of property, arson and threats of arson, angry protests, lewd demonstrations, intimidating emails and phone calls, hate mail, mailed envelopes containing white suspicious powder, blacklisting, loss of employ-

ment and job opportunities, intimidation and reprisals on campus and the classroom, acts of intimidation through photography, economic reprisals and demands for hush money, and gross expressions of anti-religious bigotry. Plaintiffs' Motion, 7:14–8:2. For their part, Defendants disagree with Plaintiffs' characterization of the evidence. Before turning to the sufficiency of Plaintiffs' evidence, however, there is one core point pertaining to the *Buckley* test itself that necessitates initial consideration.

■ First and foremost, the parties hotly contest whether Plaintiffs are entitled to seek refuge under the exemption provided by *Buckley* and its progeny because that exemption was created for, and historically has been applied only to, "minor parties" or small, persecuted groups whose very existence depended on some manner of anonymity. Despite their ongoing contention that anyone making the requisite showing of threats, harassment and reprisals is entitled to the exemption, Plaintiffs' Reply, 3:14–4:3, Plaintiffs did acknowledge at oral argument that the "minor party" element is a relevant consideration before the Court. This Court previously addressed the same issue in its Order Denying Preliminary Injunction finding that:

> Both *Buckley* and *Brown* addressed the need to balance the government's diminished interest in the disclosure of contributors to minor parties against the burden imposed on those small groups by requiring such disclosure. In light of clearly established precedent, this Court is unable to say that the State's interest here is similarly diminished or that the Plaintiffs' potential burden is even remotely comparable.
>
> Unlike the facts in *Brown*, the proponents of Proposition 8 succeeded in persuading over seven million voters to sup-

port their cause. They were successful in their endeavor to pass the ballot initiative and raised millions of dollars in the process. This set of circumstances is a far cry from the sixty-member SWP party, repeatedly unsuccessful at the polls, and incapable of raising sufficient funds. Indeed, it became abundantly clear during oral argument that Plaintiffs could not in good conscience analogize their current circumstances to those of either the SWP or the Alabama NAACP circa 1950.

Additionally, the Court has already extensively evaluated the nature of the State's interest[7] and, in light of the marked differences between this and every other case in which an exemption has been allowed, simply cannot by any stretch of the imagination say that the Government's interest "is so insubstantial that the Act's requirements cannot be constitutionally applied" to Plaintiffs. To the contrary, as applied to the massive movement waged by Plaintiffs, the State's interest in disclosure is at full force.

Similarly, the greater burden alleged to be imposed on Plaintiffs also necessarily derives from their minority status. The Second Circuit stated in *Federal Election Commission v. Hall–Tyner Election Campaign Committee* that "[a]cknowledging the importance of fostering the existence of minority political parties, we must also recognize that such groups rarely have a firm financial foundation. If apprehension is bred in the minds of contributors to fringe organizations by fear that their support of an unpopular ideology will be revealed, they may cease to provide financial assistance. The resulting decrease in con-

---

**7.** In its Order Denying Preliminary Injunction, the Court began by analyzing the applicable standard of review and the State's inter-

est in compelled disclosure. These issues are discussed in the current context below.

tributions may threaten the minority party's very existence. Society suffers from such a consequence because the free flow of ideas, the lifeblood of the body politic, is necessarily reduced. Accordingly, a nation dedicated to free thought and free expression cannot ignore the grave results of facially innocuous election requirements." 678 F.2d 416, 420 (2d Cir.1982).

Moreover, "[t]he power of a government to repress dissent is substantial and can be exercised in a myriad of subtle ways. Privacy is an essential element of the right of association and the ability to express dissent effectively ... [F]orced revelations would likely lead to 'vexatious inquiries' which consequently could instill in the public an unremitting fear of becoming linked with the unpopular or unorthodox." *Id.*

Notably absent from this case is any evidence that those burdens hypothesized by the Supreme Court would befall the current Plaintiffs. There is no evidence that their financial backing is so tenuous as to render them susceptible to a relatively minor and entirely speculative fall-off in contributions.

There is surely no evidence that the seven million individuals who voted in favor of Proposition 8 can be considered a "fringe organization" or that their beliefs would be considered unpopular or unorthodox. Finally, there is no evidence that any of Plaintiffs' contributors intend to retreat from the marketplace of ideas such that available discourse will be materially diminished.

Finally, it would appear that, while minor status is a necessary element of a successful as-applied claim, even minor status alone could not independently sustain Plaintiffs' current cause of action. *Brown* and its progeny each involved groups seeking to further ideas historically and pervasively rejected and vilified by both this country's govern-ment and its citizens. In dicta, the Ninth Circuit addressed this pattern when it rejected a plea for exemption waged by a contributor to a minor party that "was not promoting a reviled cause or candidate." *Goland v. U.S.*, 903 F.2d 1247, 1260 (9th Cir.1990).

The facts in the current case could not be more distinguishable from those in which successful challenges have been brought. Here, Plaintiffs orchestrated a massive movement to amend the California Constitution. Proponents of the initiative were successful in their endeavor, raising nearly $30 million, securing 52.3% of the vote and convincing over seven million voters to support Proposition 8. Plaintiffs did not seek to promote a "reviled cause," and instead sought to legislate a concept steeped in tradition and history. Accordingly, in light of Plaintiffs' success at the polls and the State's ... informational interest, the Court cannot say that the Government's interest in this case is so insubstantial or the burden on Plaintiffs so great as to warrant an exemption from disclosure.

Plaintiffs nonetheless would have the Court find these comparisons irrelevant. Plaintiffs contend that the *Buckley* Court's reference to "minor" parties is applicable only in the context of its rejection of the request before it for a blanket exemption. See Motion for Preliminary Injunction, 13:19–24. According to Plaintiffs, the Supreme Court determined in *Buckley* that if a group could prove there was a reasonable probability that disclosure would lead to harassment, threats, and reprisals, an exemption was required. However, Plaintiffs' interpretation renders superfluous the *Buckley* Court's analysis of the relative governmental interest and individual burdens in the context of minor parties.

Neither did the *Brown* Court so broadly interpret *Buckley* when it repeated, "The First Amendment prohibits a state from compelling disclosures by a minor party that will subject those persons identified to the reasonable probability of threats, harassment or reprisals." *Brown*, 459 U.S. at 101–102, 103 S.Ct. 416 (emphasis added).

Since *Buckley*, as-applied challenges have been successfully raised only by minor parties, specifically those parties, as discussed, having small constituencies and promoting historically unpopular and almost universally-rejected ideas. As stated, in *Brown*, the SWP consisted of only sixty members in Ohio. *Id.* at 88, 103 S.Ct. 416. The parties' "aim was the abolition of capitalism and the establishment of a workers' government to achieve socialism." The party was historically unsuccessful at the polls though its members regularly ran for public office. *Id.* Additionally, campaign contributions and expenditures ... averaged approximately $15,000 annually." *Id.* at 89, 103 S.Ct. 416.

Similarly, in *Hall–Tyner*, a committee supporting the Communist Party successfully sought exemption from state disclosure laws. 678 F.2d 416. Later, in *McArthur v. Smith*, members of the SWP, described as a "small and unpopular political party," again successfully challenged state disclosure requirements. 716 F.Supp. 592, 593 (S.D.Fla. 1989). There is simply no plausible analogy to be had in this case.

Finally, this Court is confident that the Supreme Court's decisions in *Buckley* and *Brown*, both of which narrowly articulated the instant exception to disclosure laws, were not made without great consideration. Prior courts surely were aware that members of major parties might potentially, on some future occasion, become the target of threats or harassment at the hands of extremist members of an opposing group. Despite that possibility, the Supreme Court created an exception not for the majority, but for those groups in which the government has a diminished interest. *ProtectMarriage.com*, 599 F.Supp.2d at 1214–1216. Nothing before the Court today renders its above analysis inapplicable. To the contrary, the Court stands by its prior conclusion from almost three years ago and finds that Plaintiffs' inability to make a principled analogy to the parties in the above cases is fatal to their current claim.

Plaintiffs' reliance on dicta in *Doe v. Reed*, —— U.S. ——, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010) ("Reed"), for the proposition that the Supreme Court has already determined Plaintiffs are privy to the exemption does nothing to change this Court's opinion. Reed concerned a challenge, by groups and individuals similar to Plaintiffs, to Washington's compelled disclosure requirement insofar as those requirements pertained to referendum signatories. According to Plaintiffs, "the [*Reed*] Court never so much as hinted that the exposure exemption would not be available to the group. To the contrary, a clear majority of the Court agreed that an exemption was indeed available to the group (although the Justices differed widely as to the threshold showing of threats, harassment, or reprisals that would be required to grant an exemption)." Plaintiffs' Reply, 4:5–9. Plaintiffs overstate their case.

The issue before the *Reed* Court was "not whether disclosure of [a] particular petition would violate the First Amendment, but whether disclosure of referendum petitions in general would do so." 130 S.Ct. at 2815. Accordingly, *Reed* "[left] it to the lower courts to consider in the first instance the signors' more focused claim concerning disclosure of the

information on [that] particular petition." *Id.* Plaintiffs thus appear to argue that, by remanding for the lower courts to consider Plaintiffs' as-applied challenge based on any potential threats, harassment or reprisals contributors might suffer upon disclosure, the Supreme Court somehow sanctioned application of the *Buckley* exemption to major parties. However, Justice Alito was the only Justice that even alluded to the possibility that the Washington plaintiffs might succeed in their as-applied challenge, and his sweeping assertions as to the strength of Plaintiffs' case are premature given the posture of the case before that Court.[8] *See id.* at 2823–3827. Accordingly, nothing in *Doe v. Reed,* at least at this juncture, overrides the clear statements made in past Supreme Court cases indicating that disclosure exemptions were primarily intended to combat harms suffered by small, persecuted groups.

Even if Plaintiffs could overcome the above hurdle, however, their evidence is still insufficient to warrant an exemption. Indeed, in its Order Denying Preliminary Injunction, this Court found Plaintiffs unlikely to succeed on the merits of their claim for the reasons reiterated below, and nothing Plaintiffs have currently presented has convinced this Court departure from its former logic is now warranted on summary judgment. In its prior Order, this Court stated:

> Unlike prior cases, in which plaintiffs alleged to have suffered mistreatment over extended periods of time, the alleged harassment directed at Proposition 8 supporters occurred over the course of a few months during the heat of an election battle surrounding a hotly contested ballot initiative. Only random acts of violence directed at a very small

segment of the supporters of the initiative are alleged.

Moreover, while Plaintiffs are quite correct that under *Buckley* evidence of harassment "from either Government officials or private parties" could suffice to establish the requisite proof of reprisals, the facts of subsequent cases evidence not only the existence of some governmental hostility, but quite pervasive governmental hostility at that. *Buckley,* 424 U.S. at 74, 96 S.Ct. 612 (emphasis added); *see also McArthur,* 716 F.Supp. at 594 ("[H]arassment, reprisals or threats from private persons are sufficient to allow [the] court to enforce the plaintiff's first amendment rights by cloaking the contributors and recipients' names in secrecy.").

Indeed, the *Brown* Court was confronted with countless acts of government harassment and retribution against members of the SWP, which are detailed above. Furthermore, in *Hall–Tyner,* the Second Circuit stated, "[t]he evidence relied on by the district judge included the extensive body of state and federal legislation subjecting Communist Party members to civil disability and criminal liability, reports and affidavits documenting the history of governmental surveillance and harassment of Communist Party members, as well as affidavits indicating the desire of contributors to the Committee to remain anonymous." 678 F.2d at 419.

Plaintiffs do not, indeed cannot, allege that the movement to recognize marriage in California as existing only between a man and a woman is vulnerable to the same threats as were socialist and communist groups, or, for that matter, the NAACP. Proposition 8 supporters

---

8. Notably, on remand, the Washington District Court rejected those plaintiffs' arguments that they were entitled to the same type of

exemption sought here. *See Doe v. Reed,* 823 F.Supp.2d 1195, 2011 WL 4943952 (W.D.Wash. October 17, 2011).

promoted a concept entirely devoid of governmental hostility. Plaintiffs' belief in the traditional concept of marriage, to disagreement, have not historically invited animosity. The Court is at a loss to find any principled analogy between two such greatly diverging sets of circumstances.

Finally, Plaintiffs' exemption argument appears to be premised, in large part, on the concept that individuals should be free from even legal consequences of their speech. That is simply not the nature of their right.

Just as contributors to Proposition 8 are free to speak in favor of the initiative, so are opponents free to express their disagreement through proper legal means. While the Court is cognizant of the deplorable nature of many of acts alleged by Plaintiffs, the Court also must reiterate that the legality or morality of any specific acts is not before it. Thus, as much as the Court strongly condemns the behavior of those who resort to violence, and/or other illegal behavior, the Court need not, indeed cannot, evaluate the proper legal consequences of those actions today.

By the same token, nothing in the Court's decision immunizes or excuses those who have engaged in illegal acts from the consequences of their conduct. Those responsible for threatening the lives of supporters of Proposition 8 are subject to criminal liability. See Troupis Decl., Exh. C (noting that the Fresno chief of police stated the department was "close to making an arrest" in the case of the death threats delivered to the mayor and a local pastor.) Those choosing to vandalize the property of individuals or the public are likewise liable. Those mailing white powder to organizations are subject to federal prosecution. In each case, there are appropriate legal channels through which to rectify and deter the reoccurrence of such reprehensible behavior. As much as those channels are available today, it is unlikely that groups previously successful in seeking exemptions were privy to the same opportunities. Again, Plaintiffs have shown no societal or governmental hostility to their cause. Contrary to groups such as the SWP, Plaintiffs can seek adequate relief from law enforcement and the legal system. Such was not the case for those thought to be supporting the SWP or communist groups, those subject to actual criminal liability based on their beliefs and their associations.

*ProtectMarriage.com*, 599 F.Supp.2d at 1217–1218.

Despite Plaintiffs attempt now to put forth additional evidence of threats, harassment and reprisals, the Court's findings remain the same. More specifically, despite the additional declarations and exhibits that are now before the Court, Plaintiffs still run into problems of proportionality and magnitude.

First, while Plaintiffs characterize their evidence as voluminous and comprised of "virtually countless reports of threats, harassment, and reprisals," Plaintiffs' Motion, 4:14–15, they have pointed to relatively few incidents allegedly suffered by persons located across the entire country who had somehow manifested their support for traditional marriage. In addition, while the evidence before this Court indicates that at least 7 million voters showed up at the California polls alone to support the passage of Proposition 8, this number, though large, still deceptively underestimates the number of supporters for Plaintiffs' cause. Indeed, this figure does not capture all individuals supporting Proposition 8 on a national scale, nor does it capture those individuals who may have no connection to California's campaign, but

have supported the same cause in other regions. Plaintiffs' evidence of harassment, nonetheless extends much farther than California's borders and includes incidents that arose in other states and that were directed at the much broader social issue of gay marriage in general.

Accordingly, even assuming Plaintiffs could, under some set of circumstances, prove an entitlement to an exemption, they would need evidence of thousands of acts of reprisals, threats or harassment, spanning much more than the short period of time covering California's ballot-initiative process to prove contributors to such a massive group are entitled to anonymity of the type justified years ago for the individuals in *Brown* and *NAACP*. The declarations of 58 individuals signed in the months just following the election, along with Plaintiffs' anecdotal evidence from the same time period as documented in Exhibits 3 and 4, is simply insufficient on the facts of this case to convince this Court an ordinary contributor to Proposition 8 would have faced any backlash worthy of quashing the names of all contributors.[9] *See, e.g., Doe v. Reed,* 130 S.Ct. at 2829 (taking the position exemptions may be permitted "in the rare circumstance in which disclosure poses a reasonable probability of serious and widespread harassment") (Sotomayor, J., concurring-joined by Stevens and Ginsburg).

■ Moreover, as the Court previously observed, notably absent from the record here are any instances in which Plaintiffs have suffered any sort of governmental backlash. While, based on the language derived from *Buckley,* governmental harassment is not necessarily a required showing, it is a factor for this Court to consider. Indeed, some governmental animosity has been present in all other cases in which an exemption has been permitted. Perhaps recognizing this, Plaintiffs argue "[t]here can be no question that in many areas in California, and around the country, views against same-sex marriage ... are extremely unpopular" and "[e]ven our courts of law have characterized those who fight against such laws as advocates of hate and bigotry who act 'without reason.'" Plaintiffs' Motion, 12:15–18. Nonetheless, any attempt by Plaintiffs to show governmental animosity here is half-hearted at best. As described above, parties entitled to an as-applied exemption (namely the NAACP and the SWP) in the past had suffered from systematic governmental discrimination, persecution and abuse. Those plaintiffs were not only directly victimized by the government, they consequently lacked adequate recourse to pursue means short of nondisclosure to protect against private violence. In this case, Plaintiffs cannot assert that there is some sort of governmental hostility to their cause, nor can they in good conscience argue that law enforcement was or would be non-responsive to any illegal acts directed at Plaintiffs contributors.[10]

---

**9.** Plaintiffs even acknowledge in their papers that only a minority of individuals on the other side of the campaign resorted to the complained of tactics that are cause for concern. Plaintiffs' Motion, 1:10–12 ("Some groups and individuals, *certainly a minority,* have resorted to advancing their cause, not by debating the merits of the issue, but by discouraging participation in the democratic process through acts calculated to intimidate.") (emphasis added).

**10.** Plaintiffs do argue that their contributors were victimized despite existing laws criminalizing the underlying conduct. Essentially, Plaintiffs argue those laws did nothing to deter criminal behavior. However, Plaintiffs have not alleged that any law enforcement response was insufficient, that law enforcement has somehow turned a blind eye to any criminal conduct, or that criminal sanctions will not be imposed if appropriate. That is a critical distinction between the instant case and past cases such as *Brown* and *NAACP.*

To the contrary, Plaintiffs' own evidence indicates law enforcement was not only responsive, but diligent in undertaking investigations into some of the more heinous acts alleged here. This factor is critical in light of the comments made by several concurring Justices in *Doe v. Reed,* indicating the ability of law enforcement to deal with threats, harassment and reprisals would weigh heavily against a need for an exemption. *See, e.g., Doe,* 130 S.Ct. at 2829 (exemption may be warranted "in the rare circumstance in which disclosure poses a reasonable probability of serious and widespread harassment that the State is unwilling or unable to control") (Sotomayor, J., concurring, joined by Stevens and Ginsburg); *id.* at 2831 ("From time to time throughout history, persecuted groups have been able to criticize oppressive practices and laws either anonymously or not at all ... In my view, this is unlikely to occur in cases involving the PRA. Any burden on speech that petitioners posit is speculative as well as indirect. For an as-applied challenge to a law such as the PRA to succeed, there would have to be a significant threat of harassment directed at those who sign the petition that cannot be mitigated by law enforcement measures.") (Stevens and Breyer, JJ., concurring); *id.* at 2837 ("There are laws against threats and intimidation; and harsh criticism, short of unlawful action, is a price our people have traditionally been willing to pay for self-governance.") (Scalia, J., concurring).

In addition, the vast majority of the incidents cited by Plaintiffs are arguably, as characterized by Defendants, typical of any controversial campaign. For example, picketing, protesting, boycotting, distributing flyers, destroying yard signs and voicing dissent do not necessarily rise to the level of "harassment" or "reprisals," especially in comparison to acts directed at groups in the past. Moreover, a good portion of these actions are themselves forms of speech protected by the United States Constitution. Indeed this Court previously held that:

> [T]he Court simply cannot ignore the fact that numerous of the acts about which Plaintiffs complain are mechanisms relied upon, both historically and lawfully, to voice dissent. The decision and ability to patronize a particular establishment or business is an inherent right of the American people, and the public has historically remained free to choose where to, or not to, allocate its economic resources. As such, individuals have repeatedly resorted to boycotts as a form of civil protest intended to convey a powerful message without resort to non-violent means. The Supreme Court has acknowledged these rights on many an occasion:
>
> > In *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), the Court held that peaceful picketing was entitled to constitutional protection, even though, in that case, the purpose of the picketing "was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer." *Id.* at 99, 60 S.Ct. 736. *Cf. Chauffeurs v. Newell,* 356 U.S. 341, 78 S.Ct. 779, 2 L.Ed.2d 809 [ (1958) ]. In *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 [ (1963) ], we held that a peaceful march and demonstration was protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances.
>
> *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 909, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Notably, "[s]peech does not lose its protected character ... simply because it may embarrass others or

coerce them into action." *Id.* at 910, 102 S.Ct. 3409.

*ProtectMarriage.com,* 599 F.Supp.2d at 1218.

As to Plaintiffs' allegations of "economic reprisals" in the form of voluntary or forced resignations, as opposed to cases in which a relatively high percentage of small groups seeking an exemption were actually fired from their places of employment, Plaintiffs here have documented no terminations. *See, e.g.,* SWP. Rather, Plaintiffs point only to instances of several individuals who allegedly resigned amidst controversy over their contributions to or support of Proposition 8, but even those individuals had their own supporters and nonetheless made the affirmative and individual decision to resign.

More troubling here are the few instances of violence or criminal activity that do not fall within the realm of protected speech. The Court does not take lightly the use of the mail to terrorize people with counterfeit biological agents or to threaten the lives of individuals taking a stand for their particular beliefs, nor does the Court condone the use of force or the escalation of peaceful protests to violence to make one's position known.[11] However, Plaintiffs have produced insufficient evidence that the more incendiary events on which they rely were connected to Proposition 8 or to gay marriage at all. Rather, a number of these incidents were directed at the Mormon church, which, though a backer of California's proposition, may also have been a target for any of a number of other reasons. In addition, as stated above, law enforcement appears to have responded swiftly and adequately in each of the instances Plaintiffs allege, rendering this case distinguishable from all cases in the past where exemptions have been granted. And, perhaps more importantly, the Su-

preme Court has never indicated that even a few acts of violence, when directed at a target as massive as the groups supporting Plaintiffs, would suffice to shield those groups from the scrutinizing light of the political process.

█ This Court also observes that, even assuming there is no "strict" requirement that Plaintiffs prove a chilling effect on anticipated speech, any such effect is notably absent here. Plaintiffs appear to have had no problem collecting contributions and those contributions continued to increase even during the most heated portions of the Proposition 8 campaign. Cassady Decl., ¶¶ 24–25. A few John Doe declarants mentioned they may be wary of donating in the future, but those relatively few individual statements are unpersuasive to the Court given Plaintiffs' enormous multi-state backing. Plaintiffs have therefore simply not shown any real chill, nor have they shown, as feared by *Buckley,* that Plaintiffs' movement was at all susceptible to a fall-off in contributions or that, absent an exemption, the movement might not survive. *Buckley,* 424 U.S. at 71, 96 S.Ct. 612.

Finally, this case is unique because Plaintiffs' contributors' names were actually disclosed years ago and yet Plaintiffs have produced almost no evidence of any ramifications suffered in the almost three years post-disclosure. While the evidence contained in Plaintiffs' Exhibits 3 and 4 contain a few instances of vandalism that have occurred more recently than during the height of the Proposition 8 campaign and its aftermath, none of those articles draw any real connection between the incidents alleged and the victims' support of traditional marriage. *See, e.g.,* Plaintiffs' Exhs. 4–89, 4–90, 4–91, 4–93. Even Plain-

---

11. To the contrary, those resorting to these sorts of tactics do more to undermine their cause than to further any civilized and productive discourse.

tiffs' counsel at oral argument in 2011 admitted he was only aware of one instance of harassment that had occurred post-election. Accordingly, from a practical perspective, it makes no sense to buy in to the argument that disclosure *may* result in repercussions when there is simply no real evidence in the record that such repercussions actually *did* occur in the past three years. Plaintiffs' evidence is, quite simply, stale. *See Doe v. Reed,* 823 F.Supp.2d 1195, 1205 n. 3, 2011 WL 4943952 at *10 n. 3 (W.D.Wash.2011).

Accordingly, while Plaintiffs can point to a relatively few unsavory acts committed by extremists or criminals, these acts are so small in number, and in some instances their connection to Plaintiffs' supporters so attenuated, that they do not show a reasonable probability Plaintiffs' contributors will suffer the same fate. Given the grand scale of Plaintiffs' campaign and the massive (and national) support they garnered for their cause, Plaintiffs' limited evidence is simply insufficient to support a finding that disclosure of contributors' names will lead to threats, harassment or reprisals.[12] Plaintiffs' Motion for Summary Judgment as to this claim is DENIED and Defendants' Motion for Summary Judgment is GRANTED.

### B. Whether California's $100 Reporting Threshold is Unconstitutional[13]

#### 1. Standard of review.

■ In their papers, Plaintiffs argue that the disclosure provisions in this case are subject to strict scrutiny such that those requirements must be narrowly tailored to a compelling state interest. Defendants adamantly contend that only "exacting scrutiny" is required. While the issue of the appropriate standard of review has previously been muddled, the Supreme Court recently clarified that exacting scrutiny applies here. *See Reed,* 130 S.Ct. at 2818 ("We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.' ") (internal quotations omitted); *see also Human Life of Washington Inc. v. Brumsickle,* 624 F.3d 990, 1003–1005 (9th Cir.2010). Despite their disagreement with the underlying authorities, Plaintiffs thus conceded at oral argument in 2011 that this Court is bound to apply that less stringent standard of review. Accordingly, this Court must now determine whether California's specific disclosure requirements "are substantially related to a sufficiently important governmental interest." *Id.* at 1005.

#### 2. The State's informational interest.

■ Plaintiffs assert here that the State has no interest sufficiently compelling or substantial to justify compelled disclosure. While Plaintiffs assert that a number of cases have "suggested" that the State's "informational interest may be sufficient to justify compelled ballot-measure disclosure," Plaintiffs further contend any such finding is based on a misreading of *Buckley.* Plaintiffs' Motion, 20:22–21:1. More specifically, Plaintiffs argue this informational interest is only implicated in candidate elections and is of minimal import

---

**12.** It bears mention that if the Court were to find an exemption warranted here, it is likely a similar exemption would prove warranted in any election concerning a controversial ballot measure. As a result, those issues in which the public shows the greatest interest would be subject to the least transparency.

**13.** Plaintiffs challenge the State's reporting threshold both facially and as-applied. Since Plaintiffs' as-applied challenge is based on the same arguments already disposed of by the Court above, only Plaintiffs' facial challenge will be addressed here.

when it comes to ballot-initiative campaigns. *Id.*, 21:6–12. Plaintiffs believe voters can derive all necessary information pertaining to ballot measures from the text of an initiative itself. *Id.*, 21:13–14.

Defendants counter that Plaintiffs' assertion that the State lacks a compelling informational interest in requiring disclosure "flies in the face of every relevant decision from the United States Supreme Court and the Ninth Circuit Court of Appeals over the last four decades." Defendants' Motion, 26:22–24. Defendants point to authority this Court cited in its Order Denying Preliminary Injunction for the proposition that "[c]ourts have repeatedly held that California's informational interests in requiring disclosure by ballot measure committees" is sufficiently important. *Id.*, 26:25–26.

Indeed, in its Order Denying Preliminary Injunction, this Court found the State's informational interest not only substantial, but compelling:

> According to *Buckley,* California's interests in its current compelled disclosure regime potentially fall into three categories. 424 U.S. at 66, 96 S.Ct. 612. "First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office ... Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity ... Third, ... recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations." *Id.* at 66–68, 96 S.Ct. 612. However, unlike the election before the *Buckley* Court, which concerned candidates, the instant case bears on a recent ballot initiative measure. Since *Buck-*

*ley,* the Ninth Circuit has determined that "[o]nly the informational interest applies in the ballot-measure context." *See Getman I,* 328 F.3d at 1105 n. 23. Nevertheless, the Supreme Court has repeatedly emphasized the importance of disclosure as it relates to the passage of initiatives. *See CPLC v. Getman,* No. 00–1698, slip op. at 15:9–11 (E.D.Cal. February 25, 2005) (*"Getman II"*).

Such import derives, in no small part, from the fact that "[e]very other year, California voters decide the fate of complex policy proposals of supreme public significance ... California voters have passed propositions increasing the sentences for 'third strike' criminal offenders, rendering illegal aliens ineligible for public services, banning affirmative action, mandating that public education be conducted in English, and imposing contribution limits for political campaigns." *Getman I,* 328 F.3d at 1105. In 1974, California voters even passed the initiative necessary to establish the PRA and its disclosure requirements. *See* Cal. Gov't code § 81000.

"California's high stakes form of direct democracy is not cheap. Interest groups pour millions of dollars into campaigns to pass or defeat ballot measures. Nearly $200 million was spent to influence voter decisions on the 12 propositions on the 1998 ballot. Of that total, $92 million was spent on one gaming initiative. The total amount spent by proponents and opponents of ballot measures has even outpaced spending by California's legislative candidates." *Getman I,* 328 F.3d at 1105.

Despite the fact that powerful issues are presented to the California voters and that the economic support for state initiatives is staggering, Plaintiffs argue that the public's "general want of knowledge" is insufficient to sustain the burden disclosure imposes on contributors'

First Amendment liberties. Motion, 28:11–13. However, the Government's interest before the Court cannot be diminished by characterization as a general want of knowledge. The influx of money referenced above "produces a cacaphony of political communications through which California voters must pick out meaningful and accurate messages. Given the complexity of the issues and the unwillingness of much of the electorate to independently study the propriety of individual ballot measures, ... being able to evaluate who is doing the talking is of great importance." *Getman I*, 328 F.3d at 1105. "Voters rely on information regarding the identity of the speaker to sort through this 'cacophony,' particularly where the effect of the ballot measure is not readily apparent. While the ballot pamphlet sent to voters by the state contains the text and a summary of ballot measure initiatives, many voters do not have the time or ability to study the full text and make an informed decision. Since voters might not understand in detail the policy content of a particular measure, they often base their decisions to vote for or against it on cognitive cues such as the names of individuals supporting or opposing a measure, as listed in the ballot pamphlet, or the identity of those who make contributions or expenditures for or against the measure, which is often disclosed by the media or in campaign advertising. Such cues play a larger role in the ballot measure context, where traditional cues, such as party affiliation and voting record, are absent." *Getman II*, No. 00–1698 at 17:12–28.

Moreover, this Court cannot ignore the fact that, "[v]oters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation.... Californians, as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much." *Getman I*, 328 F.3d at 1106. It follows that "[i]f our Congress 'cannot be expected to explore the myriad pressures to which they are regularly subjected,' then certainly neither can the general public. People have jobs, families, and other distractions.

While we would hope that California voters will independently consider the policy ramifications of their vote, and not render a decision based upon a thirty-second sound bite they hear the day before the election, we are not that idealistic nor that naive. By requiring disclosure of the source and amount of funds spent for express ballot-measure advocacy, California—at a minimum—provides its voters with a useful shorthand for evaluating the speaker behind the sound bite." *Id.*

That shorthand is arguably even more necessary to the evaluation of ballot initiatives than it is in the scrutiny of candidates for political office. " 'Even more than candidate elections, initiative campaigns have become a money game, where average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest.' Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown. At least by knowing who supports or opposes a given initiative, voters will have a pretty good idea of who

stands to benefit from the legislation."
*Getman I,* 328 F.3d at 1105–1106.

More to the point, "[d]isclosure ... prevents the wolf from masquerading in sheep's clothing. Proposition 199, which was on the March 1996 Primary Election ballot, provides such an example. That initiative was entitled the 'Mobile Home Fairness and Rental Assistance Act,' but the proposed law was hardly the result of a grassroots effort by mobile home park residents wanting 'fairness' or 'rental assistance.' Two mobile home park owners principally backed the measure. After the real interests behind the measure were exposed, various newspaper editorials decried the initiative's 'subtly misleading name' and explained that the initiative's real purpose was to eliminate local rent control for mobile home parks. The measure was soundly defeated, though proponents outspent opponents $3.2 million to $884,000." *Getman I,* 328 F.3d at 1106 n. 24 (emphasis in original).

The Ninth Circuit made similar statements in *CPLC v. Randolph,* 507 F.3d 1172 [ (9th Cir.2007) ]. In that case the appellate court stated, "[I]n the context of disclosure requirements, the government's interest in providing the electorate with information related to election and ballot issues is well established." *Id.* [at] 1179 n. 8.

As here, that plaintiff conceded the state's interest was compelling, but the court nevertheless engaged in an extensive discussion of why that the government's informational interest is not only compelling, but of the highest order.

[FN # 5] That court stated:

Despite the fact that CPLC conceded that California has a compelling informational interest, California also presented persuasive evidence demonstrating the importance of providing the electorate with pertinent information. Researcher David Binder conducted a telephone survey from June 23–26, 2001. "The goals of this project were to determine objectively, using established methods of scientific public opinion research, what sources of information regarding candidates and ballot measures are important to California voters." According to Binder's findings, "[m]ore than seven of ten California voters (71%) state that it is important to know the identity of the source and amount of campaign contributions to the ballot measure by both supporters and opponents, including unions, businesses or other interest groups." "Fifty seven percent (57%) of California voters state that endorsements by interest groups, politicians or celebrities are important in helping them make up their mind [sic] on how to vote on ballot measures." "A majority of California voters (57%) state they would be less likely to vote for a proposition to build senior citizen housing if the proposition was supported by a well-known and respected senior activist who was discovered to have been paid by developers to promote the proposition. Only one-third (34%) stated that this information would not make any difference in their vote."

Professor Bruce Cain, a Professor of Political Science at the University of California, Berkeley, and Director of the Institute of Governmental Studies, added that "there are several compelling reasons for such a requirement. Foremost among them is the fact that the names groups give themselves for disclosure purposes can be, and frequently are, ambiguous or misleading."

Sandy Harrison, a former journalist for radio stations and newspapers and since 1995, a press secretary and communications director for the president

pro tem of the state Senate, the state Department of Finance, and the state Controller, emphasizes this point in her affidavit:

A prime example of this was Proposition 188 on the November 1994 ballot, an effort to overturn California's recently enacted workplace smoking ban. Supporters falsely portrayed the measure as a grassroots effort by small businesses. By reviewing the campaign finance report, I was able to report to readers that it was not the work of small businesses, but actually giant tobacco companies.... If the campaign finance report had not been public, I could not have substantiated or conveyed this important information to the readers, and they may never have learned the truth about who was really behind this proposition.

According to Stephen K. Hopcraft, the President and co-owner of "a full-service public relations firm specializing in grass roots and public education campaigns[,]" "the information gleaned from ... disclosure reports is absolutely critical to assist news media and voters in ballot measure campaign.... With all the hyperbole in campaigning, the financial backing of each side gives voters a yardstick to measure the truth of the assertions." Indeed, CPLC admitted that "[b]ecause political operators in many states are able to avoid campaign finance disclosure requirements, citizens are likely to be uninformed and unaware of the tens of millions of dollars that are spent on ballot measure campaigns by veiled political actors ..."

*Randolph,* 507 F.3d at 1179 n. 8 (emphasis in original)

Thus, "because groups supporting and opposing ballot measures frequently give themselves ambiguous or misleading names, reliance on the group, without disclosure of its source of funds, can be a trap for unwary voters. For example, a tobacco manufacturing group that opposes regulations on smoking might call itself 'Citizens for Consumer Protection.' This name might mislead voters into thinking that Citizens for Consumer Protection is a consumer advocacy group when, in fact, it protects the commercial interest of the tobacco industry. If the organization's donor information is disclosed and opposing groups and the press publicize the information, voters have a better chance of discerning the organization's true interest." *Getman II,* No. 00–1698 at 18:1–12.

[FN # 6] *See also McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 128, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) ("Because FECA's disclosure requirements did not apply to so-called issue ads, sponsors of such ads often used misleading names to conceal their identity. 'Citizens for Better Medicare,' for instance, was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers. And 'Republicans for Clean Air,' which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals-brothers who together spent $25 million on ads supporting their favored candidate."); *id.* at 128 n. 23, 124 S.Ct. 619 ("Other examples of mysterious groups included 'Voters for Campaign Truth,' 'Aretino Industries,' 'Montanans for Common Sense Mining Laws,' 'American Seniors, Inc.' 'American Family Voices,' and the 'Coalition to Make our Voices Heard.'") (internal citations omitted).

"Interest groups also seek to conceal their political involvement by availing

themselves of complicated arrangements consisting of nonprofit corporations, unregulated entities and unincorporated entities. Without disclosure requirements, citizens are likely to be uninformed and unaware that tens of millions of dollars are spent on ballot measure campaigns by such veiled political actors." *Id.* at 18:14–20. Of particular relevance in this case is the number of .out-of-state individuals and corporations contributing to the passage of a California referendum. Surely California voters are entitled to information as to whether it is even citizens of their own republic who are supporting or opposing a California ballot measure.

Moreover, "[w]hen asked, voters have indicated that information regarding the source and amount of campaign contributions to ballot measures plays an important role in their decision-making. Voters rate such information as more valuable than newspaper endorsements, campaign mailings, TV and radio advertisements, and endorsements by interest groups, politicians or celebrities." *Id.* at 18:21–19:2.

"In light of the number and complexity of ballot measures confronted by California voters, the staggering sums expending to influence their passage or defeat, the very real potential for deception through the information of advocacy groups with appealing but misleading names, and voters' heavy reliance on funding source information when deciding to support or oppose ballot measures, . . . California has a compelling informational interest in providing the electorate with information regarding contributors and expenditures made to pass or defeat ballot measure initiatives." *Id.* at 19:3–12.

The disclosure requirements provide some of the only truly objective information on which the electorate can rely to make an informed decision, and the state surely has the utmost justification for requiring the disclosure of information likely to ensure that its electorate is informed and able to effectively evaluate ballot measures. If ever disclosure was important, indeed vital, to fuel the public discourse, it is in the case of ballot measures.

Thus, even if, as Plaintiffs argue, individual voters will not be "clamoring" to know the name and other pertinent information of every contributor of over $100 to every initiative, the cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill. Accordingly, the Government's interest is not only compelling, but critical to the proper functioning of the State's system of direct democracy.

*ProtectMarriage.com*, 599 F.Supp.2d at 1207–1211.

In the face of the above analysis, Plaintiffs have not in their current Motion convinced the Court the State's interest here is anything other than sufficient. In fact, since the Court issued its above Order, the Ninth Circuit has affirmed that the State's informational interest is "important":

.Providing information to the electorate is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment . . . Thus, by revealing information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention.

This vital provision of information repeatedly has been recognized as a suffi-

ciently important, if not compelling governmental interest.

*Human Life,* 624 F.3d 990, 1005–1006; *see also Canyon Ferry Road Baptist Church v. Unsworth,* 556 F.3d 1021, 1033 (9th Cir. 2009) ("[I]t is well established that, in the ordinary case, a state informational interest is sufficient to justify the mandatory reporting of expenditures and contributions in the context of ballot initiatives."). That court also reiterated that "these considerations 'apply just as forcefully, if not more so, for voter-decided ballot measures.'" *Human Life,* 624 F.3d at 1006 (quoting *Getman I,* 328 F.3d at 1105). Moreover, the court noted that "[a]ccess to reliable information becomes even more important as more speakers, more speech-and thus more spending-enter the marketplace, which is precisely what has occurred in recent years." *Human Life,* 624 F.3d at 1007. The *Human Life* court therefore concluded that "[c]ampaign finance disclosure requirements thus advance the important and well-recognized governmental interest of providing the voting public with the information with which to assess the various messages vying for their attention in the marketplace of ideas." *Id.* at 1008.[14]

In addition, the Supreme Court in *Citizens United,* also recently spoke favorably of disclosure provisions. 130 S.Ct. at 914 ("In *Buckley,* the Court explained that disclosure could be justified based on a governmental interest in providing the electorate with information about the sources of election-related spending.") (internal citations and quotation omitted); *id.* at 915 ("The disclaimers required ... provide the electorate with information, and insure that the voters are fully informed about the person or group who is speaking.") (internal quotations and citations omitted). Plaintiffs, nonetheless argue that *Citizens United* should be ignored because that case involved candidate campaigns as opposed to ballot measure initiatives. Plaintiffs' Motion, 22 n. 20. In light of the Ninth Circuit's prior recognition, however, that a State's informational interest can be even more powerful in the ballot measure elections than in candidate races, the Supreme Court's discussion in *Citizens United* cannot be ignored.

Plaintiffs nonetheless ask this Court to ignore the great weight of the above authorities and to rely instead on the Tenth Circuit decision in *Sampson v. Buescher,* 625 F.3d 1247 (10th Cir.2010), a case in which that circuit reached a different conclusion than the above courts with respect to a ballot measure campaign. According to Plaintiffs, the Tenth Circuit was correct in finding that "the justifications for requiring disclosures in a candidate election may not apply, or may not apply with as much force, to a ballot initiative." Plaintiffs' Motion, 22:19–22 (*quoting Sampson,* 625 F.3d at 1249). Plaintiffs thus ask this Court to adopt the Tenth Circuit's reasoning that "[t]he [Supreme] Court has never upheld a disclosure provision for ballot-issue campaigns that has been presented to it for review," and that "the statements by the Supreme Court supporting disclosures in ballot-issue campaigns were dicta." *Id.,* 22:22–26 (*quoting Sampson,* 625 F.3d at 1258).

When comparing ballot initiatives to candidate campaigns, the *Sampson* court reasoned:

> At issue on this appeal is a different type of campaign committee, not one

---

**14.** Plaintiffs contend the *Human Life* court's "informational interest" discussion is dicta and is not relevant here, in part because that court was asked to evaluate only political committee definitions, not disclosure requirements. Plaintiffs' Motion, 21 n. 19. Plaintiffs do not articulate, however, how the court's inquiry into the state's interest there was any less relevant to the issue before it, or how the analysis would differ here.

seeking to elect or defeat a candidate, but one seeking to prevail on a ballot initiative. A citizen voting on a ballot initiative is not concerned with the merit, including the corruptibility, of a person running for office, but with the merit of a proposed law or expenditure, such as a bond issue. As a result, the justifications for requiring disclosures in a candidate election may not apply, or may not apply with as much force to a ballot initiative. Disclosure may facilitate ad hominem arguments-for whatever they are worth-on the merits of the ballot initiative; but there is no need for concern that contributors can change a law enacted through a ballot initiative as they can influence a person elected to office.

625 F.3d at 1249.[15] That court later elaborated:

> When analyzing the governmental interest in disclosure requirements, it is essential to keep in mind that our concern is with ballot issues, not candidates. The legitimate reasons for regulating candidate campaigns apply only partially (or perhaps not at all) to ballot-issue campaigns.
>
> . . .
>
> We must therefore analyze the public interest in knowing who is spending and receiving money to support or oppose a ballot issue. It is not obvious that there is such a public interest. Candidate elections are, by definition, ad hominem affairs.
>
> The voter must evaluate a human being, deciding what the candidate's personal beliefs are and what influences are likely to be brought to bear when he or she must decide on the advisability of future governmental action. The identities of those with strong financial ties to the candidate are important data in that

evaluation. In contrast, when a ballot issue is before the voter, the choice is whether to approve or disapprove of discrete governmental action, such as annexing territory, floating a bond, or amending a statute. No human being is being evaluated. When many complain about the deterioration of public discourse-in particular, the inability or unwillingness of citizens to listen to proposals made by particular people or by members of particular groups-one could wonder about the utility of ad hominem arguments in evaluating ballot issues. Nondisclosure could require the debate to actually be about the merits of the proposition on the ballot.

*Id.* at 1255–1257.

The *Sampson* court ultimately rejected Supreme Court precedent indicating to the contrary by arguing that the high court's message regarding the value of financial disclosure in the ballot-measure context is "mixed." *Id.* at 1257. According to the Tenth Circuit, while the Supreme Court has previously spoken favorably of disclosure requirements pertaining to ballot initiatives, that Court has never rejected a challenge to such disclosures. *Id.* Accordingly, the Tenth Circuit believes those favorable discussions should be ignored as dicta. *Id.* at 1258. That appellate court thus concluded that "while assuming that there is a legitimate public interest in financial disclosure from campaign organizations, we also recognize that this interest is significantly attenuated when the organization is concerned with only a single ballot issue and when the contributions and expenditures are slight." *Id.* at 1259.

The Tenth Circuit's analysis regarding a state's informational interest in ballot initiative campaigns is unpersuasive. First, that court rejected the reasoning in sever-

---

**15.** Notably, the court's latter point appears to go to the State's inapplicable "Corruption In-

terest" rather than to its "Informational Interest."

al critical Supreme Court cases by categorizing those discussions as dicta. In addition, the *Sampson* decision is contrary to Ninth Circuit precedent that relies on the same Supreme Court authorities rejected by the Tenth Circuit to find that the State's interest in ballot initiatives is important, and even compelling. In light of the contrary Supreme Court and Ninth Circuit authority already presented to this Court, this Court declines Plaintiffs' invitation to rely on *Sampson*.

Moreover, even if this Court was persuaded by the Tenth Circuit's analysis, that case is distinguishable from the instant case on its facts. More specifically, in *Sampson* the Tenth Circuit was confronted with a challenge to a state requirement that a small group raising less than $800 register as a campaign committee in an election of just a few hundred voters. *Id.* at 1249, 1251–52. The *Sampson* court reasoned that an average citizen could not be expected to master campaign finance laws and to determine which ones apply in a given election. *Id.* at 1259–60. Accordingly, even small groups, such as the plaintiffs in that case, would have been required to hire counsel to do so. *Id.* at 1260. Obtaining legal counsel to support such a small campaign was itself a substantial burden, which was then compounded by the time plaintiffs themselves were required to expend on the subject. *Id.* Moreover, the public interest in disclosure is minimal when the value of the financial information is so small. *Id.* ("We agree with the Ninth Circuit that '[a]s a matter of common sense, the value of this financial information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level.'") (*citing Canyon Ferry Road,* 556 F.3d at 1033). Accordingly, *Sampson* held that, on the facts before it, the burden on plaintiffs in compelled disclosure of their financial information, outweighed any benefit to the State. The Court did include

the following important caveat in its decision:

> We do not attempt to draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures. The case before us is quite unlike ones involving the expenditure of tens of millions of dollars on ballot issues presenting "complex policy proposals." *Cal. Pro–Life Council, Inc. v. Getman,* 328 F.3d 1088, 1105 (9th Cir.2003). We say only that Plaintiffs contributions and expenditures are well below the line.

*Id.* at 1261. Given the limited application of the Tenth Circuit decision, its non-binding nature, and its rejection of Supreme Court precedent, *Sampson* is not controlling, and, in this Court's opinion, the better line of reasoning is that generated out of this Circuit. Accordingly, this Court now finds the State's informational interest well-established and substantial.

### 3. Relationship between the $100 reporting threshold and the State's interest.

Plaintiffs next contend that, even assuming the State's informational interest is important, the State's disclosure requirements are not appropriately tailored to that interest. Plaintiffs' Motion, 28:4–6. According to Plaintiffs, "common sense dictates-and the Ninth Circuit has found-that the 'value of this financial information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level.'" *Id.,* 28:8–10 (*quoting Canyon Ferry Road,* 556 F.3d at 1033). Plaintiffs also argue the failure to account for inflation undermines any connection between the disclosure requirements and the State's interest. *Id.,* 29:14. Contrary to Plaintiffs' assertions, Defendants contend the $100 threshold is constitutional unless it is "wholly without rationality." Defendants' Motion, 34:25–28.

Defendants further argue that the threshold is the result of "considered legislative judgment," *id.*, 36:6, and that the threshold need not be indexed for inflation, *id.*, 36:23.

This Court addressed the parties' arguments in its Order Denying Preliminary Injunction, as follows:

Plaintiffs argue that the Government's interest in the compelled disclosure of those who contributed amounts as low as $100 to support Proposition 8 is negligible. Specifically, Plaintiffs express disbelief that "the public is clamoring for the knowledge of the name, address, occupation, and employer of every person who contributed one hundred dollars or more to a ballot measure." *Id.*, 21–23. According to Plaintiffs, the State's threshold is therefore set too low and must fail for lack of adjustment for inflation. This Court disagrees and holds that the legislative line drawn is narrowly tailored to the State's compelling informational interest, that the threshold need not be indexed for inflation, and that a contrary holding would call into question scores of statutes in which the legislature or the people have sought to draw similar lines.

In *Buckley,* as here, the appellants argued "that the monetary thresholds in the record-keeping and reporting provisions lack[ed] a substantial nexus with the claimed governmental interests, for the amounts involved [were] too low even to attract the attention of the candidate, much less have a corrupting influence." *Buckley,* 424 U.S. at 82, 96 S.Ct. 612. There, the Act "required political committees to keep detailed records of both contributions and expenditures." *Id.* at 63, 96 S.Ct. 612. As in the instant case, "[e]ach committee ... [was] required to file quarterly reports. The reports [were] to contain detailed financial information, including the full name, mailing address, occupation, and

principal place of business of each person who had contributed over $100 in a calendar year, as well as the amount and date of those contributions." *Id.* (internal citations omitted). On facts remarkably similar to those before this court, the Supreme Court held that "the $100 threshold was ... within the 'reasonable latitude' given the legislature 'as to where to draw the line.'" *Id.* at 83, 96 S.Ct. 612.

The Court elaborated on its decision stating, "The $10 and $100 thresholds are indeed low. Contributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences. These strict requirements may well discourage participation by some citizens in the political process, a result that Congress hardly could have intended. Indeed, there is little in the legislative history to indicate that Congress focused carefully on the appropriate level at which to require recording and disclosure. Rather it seems merely to have adopted the thresholds existing in similar disclosure laws since 1910. But we cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion. We cannot say on this bare record that the limits are wholly without rationality." *Id.*

[FN # 9] The parties dispute the level of scrutiny actually applied in *Buckley.* However labeled, the *Buckley* Court clearly determined that the $100 threshold passed constitutional muster and this Court is bound by that decision.

The Eastern District later stated that "as a general matter, the court will not second guess a legislative determination as to where the line for contribution

limits should be drawn." *CPLC* [*California Prolife Council Political Action Committee*] *v. Scully*, 989 F.Supp. 1282, 1293 (E.D.Cal.1998). The same holds true on the facts before this Court.

First, this Court finds the disclosure thresholds set in other states to be instructive. California's current $100 threshold falls well within spectrum of those mandated by its sister states, which range from no threshold requirement to $300. In fact, only six states in the United States have higher threshold requirements.

[FN # 10 Omitted.]

The Supreme Court has previously made similar comparisons. *Randall v. Sorrell*, 548 U.S. 230, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006). That Court stated, "As compared with the contribution limits upheld by the Court in the past, and with those in force in other States, [the Act's] limits are sufficiently low as to generate suspicion that they are not closely drawn." *Id.* at 249, 126 S.Ct. 2479. That Court went on to point out that "[t]hese limits are well below the limits this Court upheld in *Buckley*. Indeed, in terms of real dollars (i.e., adjusting for inflation), the Act's $200 per election limit on individual contributions to a campaign for governor is slightly more than one-twentieth of the limit on contributions to campaigns for federal office before the Court in *Buckley*. Adjusted to reflect its value in 1976, Vermont's contribution limit on campaigns for statewide office (including governor) amounts to $113.91 per 2–year election cycle, or roughly $57 per election, as compared to the $1,000 per election limit on individual contributions at issue in *Buckley*." *Id.* at 250, 126 S.Ct. 2479. However, the *Randall* Court also determined that the lower contributions limits constituted only a danger sign that the "contribution limits may fall outside tolerable First Amendment limits." *Id.* at

253, 126 S.Ct. 2479. Since the actual dollar amount of the statutory threshold was not dispositive, the Court also looked at the Act's substantial restrictions on the ability of candidates to raise the funds necessary to run a competitive election, the ability of political parties to help their candidates get elected, and the ability of individual citizens to volunteer their time to campaigns. *Id.*

Accordingly, even if this Court were inclined to make the determination, which it is not, that California's $100 disclosure threshold was too low, such a determination alone would be insufficient to warrant award of a preliminary injunction. Nevertheless, in keeping with the *Randall* Court's foray into the hypothecated effects of inflation, Plaintiffs assert that California's disclosure regime is constitutionally suspect based, in part, on its failure to account for such economic conditions.

According to Plaintiffs, the $100 disclosure threshold approved of in Buckley would equate to approximately $38.79 today. Motion, 24:6–8. Therefore, Plaintiffs contend that *Buckley* establishes the benchmark below which disclosure thresholds should not be permitted to fall.

Such a conclusion runs contrary to both logic and the law. "In *Buckley*, [the Court] specifically rejected the contention that $1,000, or any other amount, was a constitutional minimum below which legislatures could not regulate ... [The Court] referred instead to the outer limits of contribution regulation by asking whether there was any showing that the limits were so low as to impede the ability of candidates to 'amas[s] the resources necessary for effective advocacy,' 424 U.S., at 21, 96 S.Ct. 612. [The court] asked, in other words, whether the contribution limitation was so radical

in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless. Such being the test, the issue in later cases cannot be truncated to a narrow question about the power of the dollar, but must go to the power to mount a campaign with all the dollars likely to be forthcoming ... [T]he dictates of the First Amendment are not mere functions of the Consumer Price Index. [*Shrink Missouri Government PAC v. Adams*], 161 F.3d [519], at 525 [ (1998) ] (dissenting opinion)." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 397, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). Neither can the constitutional principles at issue in the current case be construed solely in terms of the rate of inflation, and the Court finds that the disclosure threshold negligibly affects, if it affects at all, Plaintiffs' ability to amass resources or to advocate their cause.

The Court also finds it relevant that numerous existing statutes contain reference to dollar values beyond which certain rights or benefits may be taken away or become unavailable. For example, California Penal Code § 487 states that when "money, labor, or real or personal property taken is of a value exceeding four hundred dollars ($400)" such a taking constitutes grand theft. Cal. Pen.Code § 487(a). Additionally, grand theft is also found "[w]hen domestic fowls, avocados, olives, citrus or deciduous fruits, other fruits, vegetables, nuts, artichokes, or other farm crops are taken of a value exceeding one hundred dollars ($100)." *Id.*, § 487(1)(A). These dollar values were set by the legislature in 1982. *See* 1982 Cal. Stat. 1693. Were the Court to accept Plaintiffs' current argument, it would call into question this and every other statutory provision in which the legislature thought to classify by dollar amount without tying that amount to some articulated rate of inflation.

The Court is unwilling to render a decision that would create such a striking precedent.

Finally, in *Buckley*, the Supreme Court stated that "disclosure requirements, as a general matter, directly serve substantial governmental interests. In determining whether these interests are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights." *Buckley*, 424 U.S. at 68, 96 S.Ct. 612. To reiterate, "[i]t is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by this legislation. In this process we note and agree ... that disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." *Id.*

Thus, disclosure requirements, by their very nature, are the least restrictive means through which to educate the electorate. The requirements do not limit the amount of contributions or expenditures by the entity or the contributor. They do not limit the entity's ability to raise funds, nor do they impose burdensome structural requirements on Plaintiffs. *See Alaska Right to Life Committee v. Miles*, 441 F.3d 773, 791 (9th Cir.2006). Moreover, Plaintiffs point to no threshold that would be more narrowly tailored to serve the State's interest. The Court simply cannot say that the cumulative effect of the disclo-

sure of the contributors of $100 is not narrowly tailored to the Government's compelling informational interest.[16]

[FN # 11] As an example, the public could very well be swayed by the fact that numerous donations to Plaintiffs, and likely to others, came from out of state.

It appears very probable to this Court that the California electorate would be interested in knowing if a California initiative was funded by the citizens it is intended to affect or by out-of-state interest groups and individuals. In order to properly capture the number of non-California donors, it is quite logical to require a lower, rather than a higher, reporting threshold.

Accordingly, the Court finds that California's disclosure threshold is properly drawn. California's decision to compel disclosure of those who contribute in excess of $100 to groups such as Plaintiffs is narrowly tailored to the State's compelling informational interest and Plaintiffs' likelihood of success on the merits is minimal.

*ProtectMarriage.com,* 599 F.Supp.2d at 1220–1224. The Court's prior analysis still stands.

Plaintiffs nonetheless contend now that the $100 reporting threshold does nothing to combat the State's informational interest, which it attempts to define more narrowly as an interest in combating "voter ignorance." Plaintiffs' Motion, 24:12–14. Plaintiffs primarily believe that disclosure of large special interest groups will promote any such interest and that the identity of small donors, such as those contributing less than $100, is irrelevant. *Id.,* 26:1–

9. Plaintiffs also argue there are other legislative actions that can be taken to combat voter ignorance (*e.g.,* making measures simpler and clearer for voters). *Id.,* 25:1–12. Plaintiffs thus conclude that the only justification for disclosure requirements that could actually alleviate voter ignorance is the need to prevent the "wolf from masquerading in sheep's clothing." *Id.,* 27:6–18 (*quoting Getman I,* 328 F.3d at 1106 n. 24). Plaintiffs then go on to argue that this final justification cannot be met when the amount of contributions to be disclosed "sinks to a negligible level." *Id.,* 28:4–10 (*quoting Canyon Ferry Road,* 556 F.3d at 1033). First and foremost, Plaintiffs' citation to *Canyon Ferry Road* does little to further their argument.

In *Canyon Ferry Road,* plaintiff Canyon Ferry Road Baptist Church challenged Montana's campaign finance laws, including its disclosure requirements. 556 F.3d at 1023. In that case, the Church's Pastor became interested in supporting a Montana initiative amending the state constitution, as here, to define marriage as between a man and a woman. *Id.* at 1024. With the hope of having the initiative placed on the ballot, a member of the church printed out a petition and used the Church's copy machine and her own paper to print less than fifty copies of the document. *Id.* With the Pastor's approval, the member placed approximately twenty copies of the petition in the Church's foyer. *Id.* At roughly the same time, the Pastor also arranged for a simulcast entitled "Battle for Marriage," which did not expressly support or oppose any Montana initiative or candidate, to be shown at the Church. *Id.* The Church did not charge

---

**16.** As an example, the public could very well be swayed by the fact that numerous donations to Plaintiffs, and likely to others, came from out of state. It appears very probable to this Court that the California electorate would be interested in knowing if a California initiative was funded by the citizens it is intended to affect or by out-of-state interest groups and individuals. In order to properly capture the number of non-California donors, it is quite logical to require a lower, rather than a higher, reporting threshold.

for attendance and utilized unpaid public service radio announcements to advertise the event. *Id.* The Church also printed flyers, which did not mention the state initiative, publicizing the broadcast. *Id.* After the simulcast, the Pastor did speak in support of the Montana initiative. *Id.* at 1024–25. The Pastor then circulated the petition and indicated that petitions were available in the lobby. *Id.* at 1025.

The Montana initiative was successfully passed, after which groups opposing the ballot measure filed suit against the Church alleging it had created an "incidental political committee" and had failed to file the requisite disclosure forms. *Id.* The Church countered that it could not "constitutionally be subjected to the disclosure and reporting requirements applicable to 'incidental political committees' under Montana law on the sole basis of its activities of de minimis economic effect in connection with the 'Battle for Marriage' event and related petition-signing efforts in support of CI–96." *Id.* at 1028. It further argued that the Montana state law was unconstitutionally vague as applied to the Church. *Id.* The Ninth Circuit agreed, holding that "as applied to (1) the placement of the petition in its foyer and (2) [the Pastor's] exhortation to sign the petition in support of [the initiative] during a regularly scheduled Sunday service, the . . . interpretation of 'in-kind expenditures' is unconstitutionally vague." *Id.* That court also agreed "that the designation of the Church as an 'incidental committee' because of its one-time, in kind 'expenditures' of de minimis economic effect violates the Church's First Amendment free speech rights." *Id.*

More specifically, the Church argued that Montana's disclosure requirements were unconstitutional as applied to it. *Id.* at 1030–1031. While acknowledging that the State had a sufficiently important informational interest in disclosure, the court noted that the information needed "is the identity of persons *financially* supporting or opposing a candidate or ballot proposition." *Id.* at 1032 (emphasis in original). That court observed that "[t]he disclosure requirements are not designed to advise the public generally what groups may be in favor of, or opposed to, a particular candidate or ballot issue; they are designed to inform the public what groups have demonstrated an interest in the passage or defeat of a candidate or ballot issue by their contributions or expenditures directed to that result." *Id.* at 1032–33.

Looking to *Buckley,* the Ninth Circuit then asked "whether Montana's 'zero dollar' threshold for disclosure is 'wholly without rationality.'" *Id.* at 1033. The court concluded that it could not "say that the informational value derived by the citizenry is the same across expenditures of all sizes." *Id.* Moreover, "[a]s a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level. As the monetary value of an expenditure in support of a ballot issue approaches zero, financial sponsorship fades into support and then into mere sympathy." *Id.* (emphasis in original). The court also noted that the burden of reporting remains unchanged despite the minimal nature of any expenditures. *Id.* at 1034. Accordingly, the Ninth Circuit concluded that "if the Supreme Court's 'rationality' test for threshold disclosure levels has any force at all, there must be a level below which mandatory disclosure of campaign expenditures by 'incidental committees' runs afoul of the First Amendment." *Id.* On the facts before it, the *Canyon Ferry Road* court therefore held that:

Applying the disclosure provisions to the Church's *de minimis in-kind* expenditures lies beyond [the point where com-

pelled disclosure runs afoul of the First Amendment]. Expending a few moments of a pastor's time, or a marginal additional space in the Church for petitions, is so lacking in economic substance that we have already held that requiring their reporting creates fatal problems of unconstitutional vagueness. Similarly, the value of public knowledge that the Church permitted a single like-minded person to use its copy machine on a single occasion to make a few dozen copies on her own paper-as the Church did in this case-does not justify the burden imposed by Montana's disclosure requirements.

*Id.* The court specifically limited its holding, however, to the above formulation and declined to express any views regarding the constitutionality of the state's disclosure requirements pertaining to either candidate elections or to *monetary* contributions of any size. *Id.* Accordingly, while Plaintiffs attempt to carve out and rely on language that is persuasive to their position, that language is simply not on point. In addition, that case is factually distinguishable since it dealt with in-kind contributions that were entirely negligible, not monetary contributions in excess of a threshold rationally set by the state legislature. Moreover, while the in-kind contributions in that case were of no real consequence there, the totality of small contributions in this case were very consequential because a review of those contributions in the aggregate demonstrated, for example, just how much money supporting Proposition 8 was coming in to California from out of state. This Court finds it highly relevant to a California voter's decision making process whether a ballot measure amending California's Constitution is being supported by fellow Californians or by citizens of neighboring states. Accordingly, *Canyon Ferry Road,* has no real bearing on this case.

A First Circuit decision from just a few months ago is much more on point. In *National Organization for Marriage v. McKee,* that court addressed a challenge to Maine's campaign disclosure provisions requiring "anyone spending more than an aggregate of $100 for communications expressly advocating the election or defeat of a candidate to report the expenditure to the Commission." 649 F.3d 34, 59 (1st Cir.2011). As here, the plaintiff in that case argued the state lacked a sufficiently important interest justified by its $100 reporting threshold. *Id.* at 60. Also as here, that plaintiff relied on *Randall v. Sorrell,* 548 U.S. 230, 126 S.Ct. 2479, to argue that disclosure thresholds must fail unless indexed to inflation." *Id.* at 60–61. The *McKee* court rejected both of plaintiff's arguments stating:

> [I]n *Buckley,* the Court acknowledged that Congress, in setting FECA's $100 reporting threshold, appeared to have simply adopted the threshold used in similar disclosure laws since 1910—*i.e.,* over the course of more than sixty years, without any adjustment for inflation. 424 U.S. at 83, 96 S.Ct. 612. We thus reject NOM's argument that the $100 threshold is unconstitutional simply because it is static. Moreover, we cannot conclude that Maine's choice of a $100 threshold ... is wholly without rationality.

*Id.* at 61, 96 S.Ct. 612. The First Circuit's reasoning is consistent with *Buckley,* with this Court's Order Denying Preliminary Injunction and with the current facts. Plaintiff has not provided any case law or new factual data indicating that the legislative decision in this case was "wholly without rationality" or that either the *McKee* court or this Court were incorrect in upholding $100 disclosure requirements. Accordingly, Plaintiffs' Motion for Summary Judgment as to this claim is DENIED and

Defendants' Motion for Summary Judgment is GRANTED.

## C. Whether Post–Election Reporting of Contributors or a Failure to Purge Reports Post–Election is Unconstitutional

■ Finally, Plaintiffs argue that California's only possible interest, its informational interest, is insufficient to justify post-election compelled disclosure or the State's failure to purge reports post-election.[17] Plaintiffs' Motion, 33:7–8. According to Plaintiffs, "the problem of voter ignorance is, by definition, a pre-election concern." *Id.,* 33:11–13. Plaintiffs also contend any post-election State interest could be served solely through non-public, as opposed to public, disclosure. *Id.,* 35:8–12.

Defendants disagree, arguing that the State's informational interest does not end with an election. Defendants' Motion, 32:6–8. Citing to this Court's Order Denying Preliminary Injunction, Defendants contend the informational interest continues because, *inter alia,* legislation is not "carved in stone", disclosure aids future campaigns, scholars rely on disclosure information to understand the influences of campaign contributions, post-election disclosure prevents ballot measure committees from evading disclosure by accepting contributions in the final days of an election, and complete and accurate reporting requires a sufficient amount of time such that final reporting cannot be finalized on or before an election. Defendants reject Plaintiffs' assertion that non-public disclosure would serve the State's needs, arguing that non-public disclosure only would deny voters, future campaigns and scholars useful information. *Id.,* 34:14–15.

Plaintiffs raised this same argument in their Motion for Preliminary Injunction. The Court disposed of that argument in its relevant Order as follows:

Plaintiffs' Third Cause of Action seeks a holding that the PRA disclosure requirements are unconstitutional to the extent they require post-election reporting of contributors to ballot initiatives. Despite the fact that the Court has found no case law supporting the proposition, Plaintiffs contend that such reporting cannot be related to the State's informational interest because the votes have already been cast, nullifying the electorate's need for disclosure. While Plaintiffs acknowledge that the State maintains an interest in the election of candidates after an election has come and gone, they contend that the State's interest in contributors to ballot initiatives "disappears" essentially when the deciding vote is cast at the polls.

This Court disagrees. No legislation is carved in stone, incapable of repeal, nor do ballot initiatives, once passed, become a legacy that future generations must endure in silence. Indeed, it is the initiative process itself that directly allows individuals to affirm or correct prior decisions. To assume that passage of an election draws a line in the sand past which no issues remain open to public debate is simply not congruent with the form of democracy the people of California have determined to employ. Thus, it is possible that the post-election light shed on those contributors who donated during the final weeks of the campaign, and who continue to donate today, might reveal information the electorate re-

17. From a practical perspective, Plaintiffs' latter argument is somewhat illogical given the fact Plaintiffs acknowledge contribution reports are reproduced on the internet and elsewhere. It is not entirely clear what purpose would be served by the State's purging of reports post-election when that information has already entered the public domain.

quires in order to evaluate the appropriateness of its decision.

Indeed, it is unclear how " 'uninhibited, robust, and wide-open' speech can occur when organizations hide themselves from scrutiny of the voting public ... Plaintiffs' argument for striking down [the] disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled ..., but ignores the competing First Amendment interests individual citizens seeking to make informed choices in the political marketplace." *McConnell*, 540 U.S. at 198, 124 S.Ct. 619, *affirming in part and reversing in part McConnell v. Federal Election Com'n*, 251 F.Supp.2d 176, 237 (D.D.C.2003).

Thus, the Court simply cannot say that the occurrence of an election moots the electorate's need for relevant information. Here, the battle over Proposition 8 continues to be waged, both in the state courts and state legislature. The Government's informational interest cannot be met without requiring the disclosure of all pertinent contribution information such that "uninhibited, robust, and wide-open" speech can continue to be had.

Moreover, Defendants proffer a particularly practical justification for setting a post-election reporting date, namely that it would be impossible for committees to provide final financial information until their operations have wound down. Under Plaintiffs' argument, in order to obtain disclosure, committees would have to file the names of their contributors on election day. Any later filing deadline cannot, according to Plaintiffs, relate to the State's interest. Nothing short of discontinuing committee operations pre-election would render it possible for a committee to file complete reports at the height of the electoral process. Thus, the State established a future date on which full disclosure of all campaign finances is due.

The Court finds analogy to the payment of federal taxes instructive. Income is earned and due to the IRS as of the end of each calendar year. Nevertheless, the IRS requires filing and payment in April, one would assume to allow, at least in part, for wrapping up the prior year's business and for compiling the necessary documentation to render filing proper. It is the unlikely individual that would be prepared to file on the final day of the calendar year.

Finally, as discussed in the prior section, relying on the *Buckley* Court's directive to examine the burden on Plaintiffs, this Court finds that the burden imposed by requiring post-election reporting is minimal.

Thus, as in the case of its established disclosure threshold, the Government drew a line. This time the line chosen was a particular date rather than a dollar value. Nevertheless, that line does not burden any more speech than would any other chosen date. Accordingly, even under a strict scrutiny analysis, this Court finds that the post-reporting requirement is directly related to the State's informational interest and that it burdens no more speech than necessary to further that interest.

*ProtectMarriage.com*, 599 F.Supp.2d at 1224–1225.

Plaintiffs raise no new legal arguments and present no material facts not already addressed by this Court. Because Plaintiffs remaining arguments are based on their unsupported assertion that California's informational interest cannot be served by post-election reporting, Plaintiffs' arguments are rejected and their Motion for Summary Judgment is DENIED. Defendants' Motion for Summary Judgment, therefore, is GRANTED.

## CONCLUSION

For the reasons set forth in this Memorandum and Order, Plaintiffs' Motion for Summary Judgment (ECF No. 245) is DENIED, Defendants' Motion for Summary Judgment (ECF No. 259) is GRANTED, and Defendants' Motion to Strike (ECF N. 271) is DENIED as moot. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.